Charles BARNES *v.* STATE of Arkansas

CR 00-1062 55 S.W.3d 271

Supreme Court of Arkansas
Opinion delivered September 27, 2001
[Supplemental opinion on denial of rehearing
delivered November 8, 2001.*]

* CORBIN, THORNTON, and HANNAH, JJ., dissent.

*Tom Garner* and *Larry Dean Kissee*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen. and *David R. Raupp, Sr.* Ass't Att'y Gen., for appellee.

Том Glaze, Justice. Charles Barnes was convicted of capital murder and sentenced to death for the 1997 killings of Eula and Dorothy Whitlock. He raises nine points on appeal, none of which has merit.

For his first issue, Barnes challenges the sufficiency of the evidence, contending only that his conviction was unsupported by substantial evidence because it was based solely on the statement of

an accomplice, Melanie Roberts, and his own inculpatory statements. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

■ ■ Where, however, the challenge is limited to the sufficiency of the evidence corroborating the defendant's confession, our review is governed by Ark. Code Ann. § 16-89-111(d) (1987), which provides that "[a] confession of a defendant, unless made in open court, will not warrant a conviction, unless accompanied with other proof that the offense was committed." *Tinsley v. State*, 338 Ark. 342, 993 S.W.2d 898 (1999). This requirement for other proof, sometimes referred to as the *corpus delicti* rule, mandates only proof that the offense occurred and nothing more. *Id.* In other words, under the *corpus delicti* rule, the State must prove (1) the existence of an injury or harm constituting a crime and (2) that the injury or harm was caused by someone's criminal activity. *Id.* (citing *Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996)). It is not necessary to establish any further connection between the crime and the particular defendant. *Id.*; *Rucker v. State*, 320 Ark. 643, 899 S.W.2d 447 (1995)). Accordingly, we must determine whether, setting aside Barnes's extrajudicial confession, the evidence demonstrates that the crime of capital murder was committed by someone.

The evidence introduced at trial showed the following series of events. On August 10, 1997, the Sharp County Sheriff's Office received a call requesting a welfare check on Eula and Dorothy Whitlock, who were mother and daughter, at their mobile home located 6.2 miles south of Ash Flat. Deputy Sheriff Dwayne Holcomb went to the residence and found that both doors were locked, but the bedroom window on the west end of the home was open. Holcomb went to one of the windows on the east end of the living room; when he looked in, he saw the furniture was turned over and the house was in disarray. He also saw the body of Eula, age 94, lying on the floor. Holcomb then forced the trailer door open and went inside, where he found the body of 70-year-old Dorothy in the hallway outside the bedroom. Both women had wounds on their heads and necks. Autopsies of both women showed that Dorothy had died of multiple blunt and sharp-force injuries to the head and neck, including a skull fracture caused most likely by a hatchet, as well as stabbing and cutting wounds to her neck. Eula died of blunt force injuries to her head and neck,

including a fractured jaw and a "near complete transection" of the cervical vertebral body.

On May 7, 1998, investigators Dale Weaver and Joe Stidman went to interview inmates at the Van Buren County Jail. After the investigators left, Melanie Roberts asked fellow inmates Diana Gates, Susan Bowman, and Alexandria Fore if Weaver and Stidman had asked them about the murders of two elderly ladies at Ash Flat. Roberts then told Gates that she and her then-boyfriend, Charles Barnes, had committed the burglary and murders. She also told one of the matrons at the jail that she and Barnes had killed the Whitlocks. During her interview with Weaver and Stidman, Roberts provided details of the crime scene that the police had not made public, including the fact that one of the bodies had been covered with a blanket.

On the basis of this information, Arkansas State Police officers went to interview Barnes at the Brickey's Unit of the Arkansas Department of Corrections, where he was serving time on an unrelated charge. Although Barnes denied any involvement in the killings, he admitted that he had been with his girlfriend, Roberts, on the day in question. He also said that it was possible he had been inside the Whitlocks' trailer, but if he had been, he had to have been sleepwalking.

In addition to the above evidence, the State also introduced the testimony of Charles Dunn, a fellow inmate at the Brickey's Unit. Dunn testified that Barnes told him that he and a girl named Melanie got away with the murders of two elderly ladies. Dunn stated, "He was telling me how they went in and chopped them up with an axe, and that the most money that he got from them was like $43 and [a] five gallon bucket of sterling silver. . . . I believe he said one of them was like 96 years old and the other one was like 76 or something like that, they were either mother and sister or mother and daughter." Dunn's testimony was corroborated by evidence found at the crime scene: both women's purses had been emptied, and rooms, closets, and jewelry boxes had been ransacked.

Barnes contends only that his conviction was unsupported by substantial evidence because it was based solely on the statement of an accomplice, Melanie Roberts, and his own inculpatory statements. He also argues that, under Ark. Code Ann. § 16-89-111(e)(1) (Repl. 1997), a "conviction cannot be had . . . upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense."

■ Clearly, when considered in light of the *corpus delicti* rule, this argument is without merit. In a case with similar facts, *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995), the appellant Mills argued that, other than his uncorroborated confessions to two fellow inmates, there was no proof that he fired the fatal shots. This court rejected his argument, holding that under the *corpus delicti* rule, the State needed only to have proved that Mills confessed and the victim died as a result of a homicide. In the instant case, we have Barnes's confession to Dunn, Melanie Roberts's confession and implication of Barnes, and the medical examiner's testimony that the victims died as a result of homicide. The evidence was clearly sufficient to sustain the guilty verdicts.

For his second point on appeal, Barnes argues that the trial court erred in refusing to grant a mistrial when, during opening statements, the State made a reference to a statement Barnes gave to police in which he made the curious remark that he had a "vision" about "the bloody murder of two older ladies near Ash Flat." Barnes's counsel objected to the prosecutor's comment during opening statements, noting that he had a pending motion to suppress and that the court had not yet held a *Denno* hearing on that motion. The court overruled the objection and told counsel that they would have the suppression hearing the following morning.

The judge held a *Denno* hearing during the next day of trial. Barnes contended that his "vision" statement was inadmissible because he was represented by counsel when he made the statement. The State responded that Barnes had initiated the contact with the officers, and as such, there was no need for counsel to have been involved. At that time, the judge ruled that the comment about the "vision" was inadmissible because it was "[his] understanding . . . in Arkansas that if he's got a lawyer, you got to notify the lawyer." The judge made no inquiry as to whether Barnes had initiated contact with the officers before making the comment.

On appeal, Barnes argues that he was prejudiced by the fact that the jury heard the prosecutor's statement about his "vision," and even though the trial court later suppressed the statement, the damage had already been done.[1] The State responds with the following three arguments: first, there was no prejudice because the

---

[1] While the dissent contends that the prosecutor made his reference to Barnes's "vision" statement at a time when he knew that a *Denno* hearing had yet to be held on the admissibility of that statement, it was the defendant's burden to obtain the hearing he requested. Barnes filed more than thirty pretrial motions, including the two motions to suppress his statement that were filed on February 8, 2000. The trial did not begin until

statement actually was admissible; second, the trial court did not abuse its discretion in denying the motion for mistrial because the most to which Barnes would be entitled would be a remand for another *Denno* hearing; and third, any error which resulted from the prosecutor's opening statement was harmless.

■■ While the correctness of the trial court's ruling on the statement's admissibility is questionable, we decide the issue under the harmless-error rule. A similar situation presented itself in *Landreth v. State*, 331 Ark. 12, 960 S.W.2d 434 (1998). There, the defendant, Landreth, had confessed to three people the fact that he had murdered Daisy Galaher; the State also had physical evidence linking Landreth with the crime. On appeal, Landreth argued that the prosecutor, during closing arguments, improperly made reference to the fact that he had not testified in his own defense. Noting that the prosecutor's comment was impermissible, this court nevertheless affirmed Landreth's conviction, stating as follows:

> In *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court declared that references to a defendant's failure to testify violate the Fifth Amendment privilege against self-incrimination, but can be harmless error if it is shown beyond a reasonable doubt that the error did not influence the verdict. [Citation omitted.] Practical application of the *Chapman* test involves excising the improper remarks and examining the remaining evidence to determine if it can be shown beyond a reasonable doubt that the error did not influence the verdict. *Logan v. State*, 299 Ark. 266, 773 S.W.2d 413 (1989).

*Landreth*, 331 Ark. at 18 (quoting *Bradley v. State*, 320 Ark. 100, 896 S.W.2d 425 (1995)). The harmless-error rule extends to other constitutional violations as well. *See Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999) (harmless-error rule applied in the context of an involuntary confession); *see also Arizona v. Fulminante*, 499 U.S. 279 (1991).

---

February 23, 2000, thus giving him over two weeks to get a hearing scheduled. Further, although the dissent suggests that there was bad faith on the part of the prosecutor, the trial court made no such finding. Moreover, while Barnes's counsel had filed a large number of motions, it is not apparent from the abstract or the record that Barnes reminded the trial court on the day of trial that the *Denno* hearing was yet pending; indeed, Barnes did not make a comment to this effect until after the prosecutor's reference to the "vision" statement in opening arguments.

■ As in *Landreth*, after we discard the tainted comment about Barnes's "vision," we conclude that there was overwhelming evidence of Barnes's guilt, as discussed above. The State presented the confession Barnes made to Clifford Dunn, as well as Melanie Roberts's confession encompassing her knowledge of undisclosed crime scene information and implicating Barnes in the murders. Again, Barnes admitted he was with Roberts on the day of the Whitlock murders. In addition, as will be discussed more fully below, Barnes himself made the incriminating statement that he could have been in the Whitlocks' trailer, but if he was, he was sleepwalking.[2] This evidence showed beyond a reasonable doubt that Barnes and Roberts were together on the day they murdered the two elderly women, and that they did so for money. We also note that the court instructed the jury that statements of counsel are not evidence. In *Littlepage v. State*, 314 Ark. 361, 863 S.W.2d 276 (1993), this court held that a similar admonition to the jury cured any possible error. For these reasons, we hold that the prosecutor's comment about Barnes's statement did not constitute reversible error.

Barnes's third point on appeal is that the trial court should have declared a mistrial or granted a continuance when the State failed to disclose an incriminating statement, made by Barnes in the form of a letter to Melanie Roberts, until the prosecutor was cross-examining Barnes during the defense's case-in-chief. During cross-examination, the State questioned Barnes as to his communication with Roberts while he was in jail, asking particularly if he had written her a letter. Barnes replied that he did not send her a letter, but when the prosecutor asked again and showed Barnes a piece of paper, he said he "probably did." At that point, the prosecutor said that he would like to read the letter .in court. Defense counsel immediately objected, and the judge held a hearing outside the jury's presence. During that hearing, the prosecutor said he had received the letter the weekend before trial. Nevertheless, defense counsel moved for a mistrial on the grounds that withholding the letter was a discovery violation. The court denied the motion for mistrial, but gave counsel a ten minute break to discuss the letter with Barnes. After that brief recess, the court ruled that the letter was admissible, and Barnes subsequently conceded that he had written it.

---

[2] During his testimony, Barnes refuted the officers' version of his sleepwalking statement, asserting that what he had actually said was that "the only way [he] could have been there was if [he] was sleepwalking, and [he didn't] sleepwalk." The resolution of these conflicting versions of events, however, was a question for the jury to decide. *See, e.g., Solomon v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996).

■■ Barnes argues that the trial court should have excluded the letter and prevented the prosecutor from mentioning it. However, he does not contend how he was prejudiced by the letter's introduction. We have held that when the State fails to provide information during discovery, the burden is on the appellant to show that the omission was sufficient to undermine the confidence in the outcome of the trial. *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996). Prejudice, though, does not exist when the defendant already has access to the information that the State did not disclose. *Id.* Here, because Barnes wrote the letter, he knew of its existence, and cannot claim to have been prejudiced by the State's late disclosure of it.

■ In addition, this court will not presume prejudice where the appellant offers no proof of it. *See, e.g., Tucker v. State*, 336 Ark. 244, 983 S.W.2d 956 (1999). On this point, we note that Barnes failed to abstract the letter in question, and in a case in which neither the death penalty nor a life sentence is involved, we would decline to address the issue; however, as Barnes was sentenced to death, we have looked to the record and read the letter to determine if he was prejudiced. *See Watson v. State*, 313 Ark. 304, 854 S.W.2d 332 (1993). In reading the letter, we are unable to conclude that Barnes was prejudiced by its introduction. Further, Barnes merely argued before the trial court that he was prejudiced because the State caught him in a lie about the letter. However, we are unwilling to hold that a defendant should be permitted to benefit from his own fabrication. Barnes shows no prejudice, and our review reveals none.

■■ Finally, the trial court granted Barnes's request for a continuance to discuss the letter with counsel. Under Ark. R. Crim. P. 19.7, if the court learns that a party has failed to comply with a discovery rule, the court may exercise any of several options, including granting a continuance. It is within the trial court's discretion to decide which sanction to employ. *Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998); *Reed v. State*, 312 Ark. 82, 847 S.W.2d 34 (1993). Here, because Barnes obtained a continuance, which was one of the forms of relief he requested, he cannot be said to have suffered prejudice.

Barnes next argues that the trial court erred in denying his motion for mistrial during the State's closing arguments. During its argument, the State made the following comments:

Can you imagine the horror of going to bed, did you notice the video, did you hear the background of the crickets chirping?

Did anyone notice that? Crickets were chirping in the background, the methodical sound. What a peaceful sound. But can you imaging that sound and then somebody bursting in your window, literally almost having to come over the bed, swinging a hatchet.

Barnes immediately objected on the basis of the "golden rule," and the trial court sustained the objection, but denied the motion for mistrial.

Barnes now contends that the denial of the mistrial motion was error, contending that the prosecutor "repeatedly attempted to persuade the jurors to place themselves in the position of the victims." This court has pointed out that the "golden rule" argument is inadmissible because it tends to subvert the objectivity of the jury. *King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994). "It is seen as an attempt to dissuade the jurors from their duty to weigh the evidence and instead to view the case from the standpoint of a litigant or party." *Id.* (citing *Metropolitan Life Ins. Co. v. Moss*, 109 S.W.2d 1035 (Tex. 1937)).

However, a mistrial is a drastic remedy that should be ordered only when the fundamental fairness of the trial itself has been manifestly affected. *King*, 317 Ark. at 297. An admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Id.* However, among the factors we consider on appeal is whether the defendant requested a cautionary instruction or admonition to the jury, and the failure of the defense to request an admonition may negate the mistrial motion. *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997) (citing *Boyd v. State*, 318 Ark. 799, 889 S.W.2d 20 (1994)). It is also true that the failure to give an admonition or cautionary instruction is not error where none is requested. *Id.* Here, although Barnes requested a mistrial, he did not request an admonition to the jury. Having failed to so, he cannot now assert prejudice on this point.

For his fifth point, Barnes argues that a number of gruesome photographs were erroneously admitted into evidence. At trial, he had asked the court to keep many of the photographs out, contending that they were inflammatory, repetitive, and did not accurately portray the victims. The court conducted a photo-by-photo review of the allegedly offensive pictures, and did indeed rule that many of them were inadmissible.

The admission of photographs is a matter left to the sound discretion of the trial court. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d

305 (1999). When photographs are helpful to explain testimony, they are ordinarily admissible. *Id.* (citing *Williams v. State*, 322 Ark. 38, 907 S.W.2d 120 (1995)). Further, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. *Id.* Other acceptable purposes are to show the condition of the victims' bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). Absent an abuse of discretion, this court will not reverse a trial court for admitting photographs into evidence. *Id.*

 Here, admittedly revolting photographs were used by the medical examiner, Dr. Frank Peretti, in his discussion of the injuries suffered by the Whitlocks and how they died; however, because the photos were used to illustrate and explain his testimony, and to show the nature and extent of the women's wounds, the court did not abuse its discretion by admitting them into evidence. In addition, the crime scene photographs depicted both the location in which the bodies had been found, as well as the fact that the house had been ransacked. As such, they were relevant not only for the purposes listed above, but also to prove both the felony burglary element and the element of the capital murder charge requiring that the killing be done under circumstances manifesting extreme indifference to human life.[3] Thus, we conclude that the trial court did not err with respect to the admission of the photographs.

Next, Barnes asserts that the trial court erred in denying his motion to suppress the statement he gave to police officers after those officers conducted a polygraph examination on him.[4] At the conclusion of the polygraph exam, conducted on May 19, 1999,

---

[3] Barnes was charged under Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997), which states, in relevant parts that a person commits capital murder if he "commits . . . burglary . . . and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life."

[4] Barnes gave the statement at issue here after the conclusion of the polygraph examination. The argument on appeal does not raise, and we do not address, any question regarding the introduction of the results of the polygraph exam, which of course are inadmissible. *See* Ark. Code Ann. § 12-12-704 (Repl. 1999); *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001).

Barnes stated that there "was a possibility that he was inside the [Whitlocks'] trailer; however, if he was, he had to have been sleep-walking." The trial court held a *Denno* hearing in February of 2000, and later ruled that the State could introduce Barnes's statement.

On appeal, Barnes challenges this ruling on two fronts. First, he urges that the State did not turn over discovery materials concerning the polygraph examination, which deprived him of the opportunity to effectively cross-examine the officer who elicited the statement from him. Citing *Clark v. State*, 26 Ark. App. 268, 764 S.W.2d 458 (1989), he contends that discovery materials requested by the defense must be furnished in sufficient time to permit beneficial use of them, and he claims that, because the State did not give him the polygraph examiner's report until the day of the hearing, he did not have time to analyze the reports so he could conduct an effective cross-examination.

██ ██ This court has held that it is reversible error when a prosecutor fails to comply with a defendant's timely request for disclosure of information, when that failure results in prejudice to that defendant. *Lee v. State*, 340 Ark. 504, 11 S.W.3d 553 (2000). When the prosecutor fails to provide information, the burden is on the defendant/appellant to show that the omission was sufficient to undermine confidence in the outcome of the trial. *Id.* Barnes fails to make this showing. In his brief, he merely alleges that prejudice occurred, but he makes no definite statement as to how he was prejudiced. In addition, Barnes thoroughly cross-examined Ron Stayton, the officer who administered the polygraph exam, during the *Denno* hearing about the administration of the polygraph exam, whether anyone had informed Barnes of his rights prior to the exam, and whether the information had been provided to the prosecutor.

██ ██ Further, this point does not warrant reversal because the trial court did not err in denying the motion to suppress. When we review a trial court's ruling on a motion to suppress, we review the evidence in the light most favorable to the State and make an independent determination based upon the totality of the circumstances. *Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000) (citing *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999); *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998)). Further, this court will only reverse a trial court's ruling on a motion to suppress if the ruling was clearly erroneous. *Id.* In determining voluntariness, this court looks to whether the statement and waiver were the result of free

and deliberate choice rather than coercion, intimidation, and deception. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999).

Here, Investigator Dale Weaver testified at the *Denno* hearing that he read Barnes his *Miranda* rights, and that Barnes waived his rights and asserted his willingness to talk to the police. Weaver said that he did not make any threats, promises, or coerce Barnes in any manner, and Barnes did not appear to be intoxicated and seemed capable of understanding his rights. Investigator Stan Witt also testified that he was present during the second of the two interviews with Barnes, and that Weaver informed him that he had read Barnes his *Miranda* rights. Finally, Ron Stayton testified that he administered the polygraph exam, as well as a pretest interview; he also noted that Barnes informed him that he (Barnes) had already been read his rights.

Barnes offered no testimony or other evidence to refute that presented by the State, *see Friend v. State*, 315 Ark. 143, 865 S.W.2d 275 (1993), and as such, the trial court's decision not to suppress the statement was not clearly erroneous.

For his seventh point on appeal, Barnes argues that the court erred in overruling his objection to the prosecutor's cross-examination, during which he brought up Barnes's prior convictions for residential burglary and theft of property. When Barnes acknowledged having pled guilty to these earlier crimes, the prosecutor asked, "And do you want to tell the ladies and gentlemen of the jury the age of the ladies whose home you burglarized?" Defense counsel objected immediately, saying to the court, "That's improper," and the court stated simply, "Overruled. 404(b)." The prosecutor then had Barnes go into some detail about the earlier crime, in which he burglarized the home of an elderly lady.

On appeal, Barnes contends that this evidence was not admissible under Ark. R. Evid. 404(b), arguing that the mere fact that he pled guilty to an earlier burglary was irrelevant, because the two crimes were not similar. In matters relating to the admission of evidence under Arkansas Rules of Evidence 404(b), a trial court's ruling is entitled to great weight and will not be reversed absent an abuse of discretion. *Cook v. State*, 345 Ark. 264, 45 S.W.3d 820 (2001). Rule 404(b), of course, provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evidence offered under Rule 404(b) must be independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Cook*, 345 Ark. at 270 (citing *McGehee v. State*, 338. Ark. 152, 952 S.W.2d 110 (1999)). The list of exceptions to inadmissibility in Rule 404(b) is not an exclusive list, but instead, it is representative of the types of circumstances under which evidence of other crimes or wrongs or acts would be relevant and admissible. *Id.* (citing *Williams v. State*, 343 Ark. 591, 602, 36 S.W.3d 324, 331 (2001)).

Although Barnes argues that the State introduced this evidence to prove his *modus operandi*,[5] we conclude instead that the State was asking about Barnes's prior burglaries as proof of his motive, preparation, and plan in the present case, as the Whitlocks' home had also been ransacked and burglarized. In *Sasser v. State*, 321 Ark. 438, 902 S.W.2d 773 (1995), this court stated as follows:

> The degree of similarity between the circumstances of prior crimes and the present crime required for admission of evidence under Rule 404(b) is a determination that affords considerable leeway to the trial judge, and may vary with the purpose for which the evidence is admitted. *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 112, n. 4 and accompanying text (2d ed. 1994) ("To be probative, prior criminal acts must require an intent similar to that required by the charged crime, although it is usually said that the prior crime need not closely resemble the charged crime."); 1 John W. Strong, McCormick on Evidence § 190, n. 31 and accompanying text (4th ed. 1992) ("The similarities between the act charged and the extrinsic acts [admitted to show the act charged was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge] need not be as extensive and striking as is required . . . [to show modus operandi]").

*Sasser*, 321 Ark. at 447. Thus, although the degree of similarity between the earlier crime and the present one was not striking, nevertheless, in both instances, Barnes broke into the homes of elderly women in order to rob them. Thus, the evidence of his prior conviction was relevant to show that he possessed the same intent, motive, and plan — that is, to rob — as he did in the earlier

---

[5] To offer 404(b) evidence to prove *modus operandi*, two requirements must be met: 1) both acts must be committed with the same or strikingly similar methodology; and 2) the methodology must be so unique that both acts can be attributed to one individual. *Diffee v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995).

case, and the trial court did not abuse its discretion in permitting the prosecutor to delve into this line of questioning.

Barnes's eighth point on appeal is that the trial court erred in refusing to grant him a continuance with respect to the testimony of Clifford Dunn. Barnes orally moved for a continuance on February 14, 2000, alleging that the State had not notified him until February 7 that it would be calling Clifford Dunn to testify about Barnes's confession. The defense had also filed a motion for discovery sanctions with respect to the State's withholding of that information; in that motion, Barnes asserted that the State did not provide him with a transcript of Dunn's statement until February 8. At the hearing on the motion, the State replied that Dunn's statement was specifically set out in the affidavit of probable cause filed along with the felony information charging Barnes with capital murder. The State also noted that, months before the motion was filed, there had been a report, specifically listed in discovery, indicating Dunn would be a witness. Further, the prosecutor pointed out that his office maintained an open-file policy, and that Barnes's attorneys had been welcome to come copy anything they needed at any time. The court denied the motion for continuance.

A trial court's decision to grant or deny a continuance is within its sound discretion, and that decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *Dirickson v. State*, 329 Ark. 572, 953 S.W.2d 55 (1997). Further, it is the appellant's burden to demonstrate how he was prejudiced by the denial of the continuance. *Davis v. State*, 318 Ark. 212, 885 S.W.2d 292 (1994). When a motion for continuance is based on a lack of time to prepare, we will consider the totality of the circumstances. *Id.*

Here, defense counsel admitted that he had been aware of Dunn's existence from the very beginning, and stated that he had made a "tactical decision" as to how to proceed with the case "knowing [the State] had not listed Mr. Dunn." Barnes knew about the possibility that Dunn might be called, and thus he cannot now be heard to complain that the situation did not play out the way he hoped. *See Stephens v. State*, 342 Ark. 151, 28 S.W.3d 260 (2000) (a defendant is not entitled to rely on discovery alone as a substitute for thorough investigation). Because Barnes has not demonstrated how he was prejudiced, this court cannot conclude that the trial court's denial of the continuance was in error.

Finally, Barnes argues that the trial court should have granted him a continuance in order to obtain an additional mental evaluation after Melanie Roberts testified that Barnes had a "split personality." Roberts, who had previously pled guilty to the murders, recanted her confession on the stand and claimed that she and Barnes did not kill the Whitlocks. The prosecutor, however, impeached her with her prior statement in which she confessed to the police; in that statement, she recounted how Barnes occasionally called himself "Chaz"[6] and physically threatened and abused her. During her testimony, Barnes asked for another mental evaluation and a continuance "until that issue can be addressed by a psychiatrist to see if we have a mental disease or defect defense based upon split personality which was not covered in the first examination."

By the time of trial, Barnes had already undergone two other mental evaluations, both of which diagnosed him as sociopathic, but otherwise capable of standing trial. In addition, he had also filed a "Motion to Withdraw Notice of Mental Disease of Defect," in which he stated that he did not dispute the mental fitness determination and sought to withdraw the previously filed notice that his mental condition would be an issue in the trial. Further, Roberts's statement, in which she alluded to Barnes's "split personality," had been available to defense counsel early on, thus giving Barnes ample time to investigate this facet of the case.

Again, we review the trial court's denial of a continuance to determine if there was an abuse of discretion. Given the circumstances described above, and also given the fact that any further mental evaluations after the first one required under Ark. Code Ann. § 5-2-305 (Repl. 1997) are "discretionary with the trial court," see *Dyer v. State*, 343 Ark. 422, 36 S.W.3d 724 (2001), we cannot say that the trial court abused its discretion in denying Barnes's last-minute motion for a continuance to seek yet another mental evaluation.

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the transcript of the record before us has been reviewed for adverse rulings objected to by appellant but not argued on appeal, and no reversible errors were found.

For the foregoing reasons, Barnes's conviction and sentence are hereby affirmed.

---

[6] "Chaz" was the name by which Roberts referred to Barnes's "other" personality.

CORBIN, THORNTON, and HANNAH, JJ., dissent.

J IM HANNAH, Justice, dissenting. I disagree with the majority on the issue of the "night vision" statement and respectfully dissent. This case should be reversed and remanded for a new trial. What is at issue here is whether Charles Barnes has been convicted through a judicial process that is defective in some fundamental respect, in this case, through prosecutorial misconduct. Contrary to the majority's view, the issue is not simply one of sufficiency of the evidence viewed through harmless error. The credibility of the judicial system is in question.

Barnes had filed a motion to suppress the "night vision" statement and requested a hearing. The trial began without a hearing on the motion. The following occurred during opening statement by the prosecuting attorney:

> — Many investigators came to the scene as you can imagine, and Stan Witt will tell you that upon, that upon his investigation of the murder which lasted, I believe it was about seventeen months until Charles Barnes was charged, he'll tell you that while investigating these murders, that Charles Barnes asked at some point to speak with the officers and Mr. Weaver was involved in that also. And he told them that he had had, quote a vision.

> BY MR. KISSEE: Judge, we object. May we approach the bench?

> BY THE COURT: Yeah.

(Thereupon the following is held at the bench out of the hearing of the jury.)

> BY MR. KISSEE: Your honor, as we'd talked before we came back in here, we have a motion pending to suppress this and we requested a Denno hearing, and we were not granted that so we object to the prosecutor being able to bring this out in front of the jury.

> BY THE COURT: Overruled. We'll have it after the opening tomorrow and if we suppress it, he won't talk about it.

(Thereupon the following is held in open court in the hearing of the jury.)

BY MR. LAMBERT: He will, Charles Barnes asked to speak to the officers, and he told them that he had a vision about the bloody murder of two older ladies near Ash Flat, —

During the next day of trial, the judge held a *Denno* hearing. No testimony was given during the hearing. Barnes alleged that the "vision" statement was inadmissable because at the time of the statement, he was represented by counsel. The State alleged that Barnes initiated the contact with the officers. The trial judge ruled that the vision statement was inadmissable because Barnes had a lawyer and the lawyer was not notified. No inquiry was made as to whether Barnes initiated the contact with the officers before making the statement.

It was clearly error for the prosecution in opening statement to tell the jury about Barnes's "vision" statement prior to the trial court conducting a *Denno* hearing and ruling the statement inadmissible. The majority holds that this was harmless error in affirming the convictions. The majority sets out the admissible evidence tending to show Barnes was the assailant. The admitted evidence introduced through Dunn, Roberts, and the polygraph statement is relevant on the issue of whether Barnes was the assailant. However, the "vision" statement recounted to the jury by the prosecutor in his opening statement and found inadmissible below is of a profoundly different character than any other piece of evidence offered. The "vision" statement had the impact of being not only a confession, but one that was far more prejudicial than even a typical confession. By recounting the statement that Barnes was having a vision "about the bloody murder of two old ladies near Ash Flat," the prosecutor was conveying very strong evidence, compelling evidence, that Barnes was so distraught over the brutal murders he had committed that his sleep was being invaded by remorse and regret born of guilt that manifested as visions of carnage as his tortured mind compelled him to revisit the scene of his horrible crime. The statement is as damning as any one might imagine. Its introduction in opening is an understandably astute strategic move by the prosecution; however, its use is disappointing where the prosecutor knew its admissibility was in issue. The prosecutor knew a *Denno* hearing on that very issue was yet to be held. In spite of this knowledge, the events in opening show most clearly the prosecutor's intent to get this statement before the jury. Not only did he mention a vision by Barnes, but immediately after objection to that mention, and after the trial court advised that he would conduct the *Denno* hearing the next day, the prosecutor then told the jury the content of the "vision" statement.

The majority relies on *Landreth v. State*, 331 Ark. 12, 960 S.W.2d 434 (1998), in support of their harmless-error analysis. I respectfully submit that *Landreth* simply is not on point. The court in *Landreth* relied on the harmless-error doctrine. A harmless-error inquiry is appropriate only when the trial was not fundamentally unfair. *Pope v. Illinois*, 481 U.S. 497 (1987); *Allen v. State*, 310 Ark. 384, 838 S.W.2d 346 (1992). *See also, Hagen v. State*, 315 Ark. 20, 864 S.W.2d 856 (1993). Under discussion in *Landreth* was whether, after discarding testimony tainted by a comment in closing argument, intended to bring to the jury's attention that the defendant did not testify, there remained overwhelming evidence of guilt which rendered the improper comment harmless beyond a reasonable doubt. Thus, in *Landreth,* the issue was one of sufficiency of the evidence. This court found that only part of the evidence was tainted by the statement in closing argument, and that even if that tainted evidence were discarded, evidence of overwhelming guilt remained. Obviously, the jury in *Landreth* was aware that the defendant had not testified even before the prosecutor made the remark.

The present case is not comparable to *Landreth*. Here, the ury was told in opening, at the very outset of the case, that Barnes had in effect confessed to the murder. Not a shred of evidence had been introduced when the prosecutor intentionally told the jury about a statement that he knew might not be admissible. Every piece of evidence on which the majority relies naturally followed the opening statement. How could the jury not be tainted in its entirety by the opening statement? Once the highly prejudicial confession was detailed to the jury, the evidence that followed simply reinforced the conclusion of guilt intentionally placed in the jurors's minds by the prosecutor in opening statement. Thus, the issue in the case before us is one of fundamental fairness. To find as the majority now does is to substitute its judgment for that of the jury, which this court has stated it will not do. *Parker v. State*, 300 Ark. 360, 779 S.W.2d 156 (1989). To find as this court has, it must review the evidence and conclude, that had it been sitting as the jury, Barnes would have been convicted. This is so because the entire jury was tainted and may not be relied on. In the present case, the temptation to delve into analysis of sufficiency of the evidence blinds us to the real issue — one of elemental trial error — which, rather than impacting the weight of the evidence, is one so grievous that the judicial process has been fundamentally flawed and only re-adjudication of guilt will cure the error.

Likewise, the cite by the majority to *Littlepage v. State,* 314 Ark. 361, 863 S.W.2d 276 (1993), is of no avail. Therein, again, an

alleged error by the prosecution in closing, whereby he warned what would happen in Malvern if the defendant were not convicted, did not taint the entire trial. An analysis similar to that in *Landreth* was undertaken, which is no more applicable to this case than was *Landreth*. In our case, the bell was rung during the opening statement, and the instruction at the end of the trial could not unring the bell in the minds of the jury.

The majority finds the prosecutor's error is harmless error, that the evidence shows beyond a reasonable doubt that Barnes and Roberts were together on the day they murdered the two elderly women, and that they did so for money. That conclusion begs the issue. The issue is whether the defendant has been convicted through a judicial process that is defective through prosecutorial misconduct.

In the context of a discussion of allowing retrial as a remedy for trial error, the United States Supreme Court stated:

> In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a Judicial process which is defective in some fundamental respect, *e.g.* incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a readjudication of his guilt free from error, Just as society maintains a valid concern for insuring that the guilty are punished.

*United States v. Burks*, 437 U.S. 1, 5 (1978). *See also, Davis v. State*, 33 Ark. App. 198, 804 S.W.2d 373 (1991). This court has long held that a prosecuting attorney should not be tempted to appeal to prejudices, pervert testimony, or make statements to the jury, whether true or not, that have not been proved. The desire for success should never induce the prosecutor to endeavor to obtain a conviction by arguments except those that are based upon the evidence in the case. *Timmons v. State*, 286 Ark. 42, 688 S.W.2d 944 (1985). Under these circumstances, this court has stated it "is bound to reverse." *Timmons*, 286 Ark. at 44. This court has many times reversed judgments of conviction where the prosecutor made prejudicial statements that had no basis in the evidence presented. *Garza v. State*, 293 Ark. 175, 735 S.W.2d 702 (1987); *Simmons and Flippo v. State*, 233 Ark. 616, 346 S.W.2d 197 (1961). To be mentioned in opening, the evidence must be admissible. *Rank v. State*, 318 Ark.

109, 883 S.W.2d 843 (1994); *House v. State*, 230 Ark. 622, 324 S.W.2d 112 (1959). In *Clark v. State*, 256 Ark. 658, 662, 509 S.W.2d 812 (1974), this court stated:

> An opening statement is limited to a 'brief statement of the evidence on which the state relies,' Ark. Stat. Ann. 43-2110 (Repl. 1964), and the issues to be tried. *Karr v. State*, 227 Ark. 777, 301 S.W.2d 442 (1957). No asserted fact should be stated by the prosecutor unless it is material evidence on the part of the state. *Smith v. State*, 205 Ark. 1075, 172 S.W.2d 249 (1943).

Here, it is clear the reference to the "vision" statement was not permissible. In *Smith, supra,* this court discussed a detailed reference to a confession by the prosecuting attorney in opening statement and why reversal was required where the statement was later found inadmissible. This court stated:

> Now back to the opening statement: when the prosecuting attorney made his opening statement to the jury, he knew (by virtue of the defendant's plea of not guilty, if in no other way) that the confession had been repudiated by the defendant. In detailing the confession to the jury in his opening statement, over the defendant's objection, the prosecuting attorney took the responsibility of the consequence of the later adverse ruling on the admissibility of the confession. Of course, the prosecuting attorney did not know in advance what the court would rule on the admissibility of the confession; but reversible error was committed in this case in detailing an alleged confession over the defendant's objections when the confession was later held to be inadmissible.

*Smith*, 205 Ark. at 1081. The events recounted in *Smith* are almost indistinguishable from those of the case before us. The difference is only that in our case the prosecuting attorney knew for a certainty the confession was being challenged. The facts of the case before us thus cry out even more for reversal. Just as in *Smith*, the prosecuting attorney detailed the confession to the jury at his own peril.

I must also note that as the majority begins its analysis of harmless error, they state, "While the correctness of the trial court's ruling on the statement's admissibility is questionable. . . ." My review of the abstract fails to reveal any basis on which the issue may be considered by this court. The prosecuting attorney failed to develop the record sufficiently and thereby precludes review. The issue of the admissibility of the statement simply is not before this court. What might occur in this regard if a retrial were provided is unclear. Presumably, the State would put on witnesses in support of

its assertions of admissibility or provide some other evidence of its admissibility.

We have in this case a prosecuting attorney who proceeded in opening statement to detail a statement to the jury even though he knew it was to be the subject of a *Denno* hearing. The statement was a compelling confession. Again, *Smith, supra,* is instructive. The *Smith* case and this case both involved a heinous crime. In *Smith,* it was the murder of a small child, and in our case the murder of two elderly ladies. The court stated:

> There was a sweet little innocent girl, a vile and heinous crime, a confession detailed by the prosecuting attorney, then the jury left for a day to draw on its own imagination as to what was going on in chambers; the result follows inevitably that no juror could eradicate from his mind what the prosecutor said in detailing the confession. Just as ink cannot be erased from snow, so the alleged confession, as detailed by the prosecuting attorney, could not be erased from the minds of the jury in this case; and the trial court made no effort to eradicate the said confession from the minds of the jury even after the confession was held inadmissible.

*Smith,* 205 Ark. at 1081. In the present case, as in *Smith,* there was an objection to the opening statement, and again, just as in *Smith,* there was no instruction by the trial court that the jury should disregard the "vision" statement, even after the determination the confession was inadmissible. The instruction given at the end of trial that statements of counsel were not evidence did not cure this error. The issue before this court is whether Barnes has been convicted through a judicial process which is defective in some fundamental respect, in this case, through prosecutorial misconduct. The facts make it clear this is so. The holding in *Smith* makes a reversal mandatory in this case. This court stated long ago, that a prosecutor acts in a quasi-judicial capacity, and that it is his duty to see that a criminal defendant receives a fair and impartial trial. *Adams v. State,* 176 Ark. 916, 5 S.W.2d 946 (1928); *Holder v. State,* 58 Ark. 473, 25 S.W. 279 (1894). A prosecutor may not discuss in his opening statement a confession that is the subject of a *Denno* hearing yet to be held. In *Holder, supra,* this court stated, "To convict and punish a person through the influence of prejudice and caprice is as pernicious in its consequences as the escape of a guilty man. The forms of the law should never be prostituted to such a purpose." This case should be reversed and remanded for a new trial. To hold otherwise is to communicate to prosecutors that this court will use the harmless–error doctrine to annul prosecutorial misconduct, even where such misconduct involves reciting to the

jury in opening statement a confession which has not yet been found admissible, and where the prosecutor knows a hearing on that subject is scheduled and might well result in the exclusion of the confession. This court has previously held that a prosecutor mentions such a confession in opening statement at his own peril. Under the majority's holding, this appears to no longer be the case. This is contrary to our prior holdings. This court has consistently held over many years that only admissible evidence may be mentioned by the prosecutor in opening statement. *Rank, supra; Houser, supra.* This is a dangerous precedent. Rather than allow the State the benefit of its misconduct, it should be required to return to the trial court and obtain admission of the statement. The facts tend to show that might well be the outcome upon remand.

CORBIN and THORNTON, JJ., join in this dissent.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

CR 00-1062 65 S.W.3d 389

Supreme Court of Arkansas
Opinion delivered November 8, 2001

*Tom Garner* and *Larry Dean Kissee*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Charles Barnes has petitioned for rehearing in this case, contending that the court's opinion delivered September 27, 2001, *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001), contained errors of fact and law. Barnes contends that the court misstated his sixth point on appeal. We wrote that Barnes asserted the State did not give him the polygraph examiner's report until the day of the hearing, and as such, he did not have time to analyze the reports so he could conduct an effective cross-examination. In his petition, however, Barnes states that he never received any materials, other than the polygraph report itself, either before trial or during the suppression hearing. We note, though, that the record reflects Barnes received not only the report, but also the polygraph examiner's data sheet, a question list, and two pages of handwritten notes.

Barnes also takes issue with our holding on this same point, wherein we concluded that he "merely alleges that prejudice occurred [as a result of the State's failure to disclose the results of the polygraph examination], but he makes no definite statement as to how he was prejudiced." *Barnes*, 346 Ark. at 106. Barnes points out that he raised several specific arguments in his reply brief to illustrate how he was prejudiced. Relying on *Yates v. State*, 303 Ark. 79, 794 S.W.2d 133 (1990), he argues that he was entitled to a copy of the recording made of the polygraph so he could have an expert review the materials to prepare for cross-examination; he also urges that he needed the materials to determine the impact of the statement on his case and to negate the impact of the statement offered by Clifford Dunn, who related to the jury that Barnes confessed his involvement in the murders.

In *Yates, supra*, this court held that the State's failure to disclose the results of a polygraph examination to the defendant prior to trial amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). There, the defendant Yates had specifically advised the trial court that his primary reason for requesting the disclosure of the polygraph material was to impeach the examining officer at the suppression hearing. Our court held that Yates was prejudiced because, from the very beginning of his trial, it was critical for him to evaluate the circumstances under which his polygraph examination was administered and upon which the examining officer's conclusions were based. Because there were questions about the circumstances under which Yates's confession was obtained, the trial judge might have ruled differently in several instances if the truth were known. *Yates*, 303 Ark. at 86-87.

Barnes urges the court to reach a similar conclusion here, insisting that because he underwent a seven- to eight-hour interrogation and polygraph test, the tapes and recordings were needed to determine the circumstances surrounding the voluntariness of the statement. Of course, when this court reviews a trial court's denial of a motion to suppress, we review the evidence in the light most favorable to the State and make an independent determination based upon the totality of the circumstances. *Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000). Further, this court will only reverse a trial court's ruling on a motion to suppress if the ruling was clearly erroneous. *Id.*

■ Here, we conclude that, although the additional materials he sought were discoverable, Barnes has offered nothing to demonstrate a link between any discovery violation regarding the polygraph materials and the voluntariness or involuntariness of his statement. While he posits that he needed the materials to have an expert examine them, he offers no additional argument as to whether or how such an expert could have shown that his statement was involuntary. Further, neither of his other two reasons for needing the materials, noted above, has any bearing on the voluntariness of his statement. Thus, we reject Barnes's argument that our opinion contains errors of law.

As a final point, we note that the dissent has reasserted its opinion that our harmless-error ruling with respect to Barnes's "vision" statement is in error. To this, we make two responses. First, Barnes's petition for rehearing dealt only with a footnote to that point, which has since been deleted from the opinion. Second, the dissent raises a new case, *Elliot v. State*, 335 Ark. 387, 984 S.W.2d 362 (1998), which was not raised or argued by any party prior to this supplemental opinion. Neither Barnes nor the State mentioned this case at trial, on appeal, or in the petition for rehearing. Irrespective, *Elliot* involved a situation where the State in opening remarks mentioned that the defendant had prior convictions, thus suggesting he was a habitual offender. Additionally, we note that we must disagree with the dissent's assertion that the "vision" statement was "the most powerful piece of evidence" presented during Barnes's trial. The State produced Barnes's confession to Clifford Dunn, as well as the confession of Barnes's accomplice, Melanie Roberts. This is not an *Elliot* situation. Simply put, we hold steadfast to our decision that the prosecutor's comment regarding Barnes's "vision" was harmless error. *See Arizona v. Fulminante*, 499 U.S. 279 (1991).

For these reasons, we deny Barnes's petition for rehearing.

CORBIN, THORNTON, and HANNAH, JJ., would grant.

JIM HANNAH, Justice, dissenting. I would grant Barnes's petition for rehearing. In this case, the State in its opening statement told the jury about Barnes's "night vision" statement prior to the trial court hearing Barnes's motion to suppress the statement. The next day the trial judge held a *Denno* hearing and found the "night vision" statement inadmissable. The majority affirmed the lower court based on sufficiency of the evidence viewed through harmless error pursuant to *Landreth v. State*, 331 Ark. 12, 960 S.W.2d 434 (1998).

Rather than *Landreth*, the case of *Elliot v. State*, 335 Ark. 387, 984 S.W.2d 362 (1998), is controlling. In *Elliot* the State mentioned Elliot's prior felony conviction in its opening statement. Following Elliott's objection, the trial court admonished the jury not to consider Elliott's prior trouble with the law. In rejecting the State's harmless error and sufficiency of the evidence argument in reversing and remanding *Elliot*, we stated:

> In the instant case, the prosecuting attorney's error in his opening statement cannot be labeled a slight one. Assuming the best intentions on the prosecutor's part, he deliberately told the jury before presenting any evidence during the guilt phase of trial that Elliott had been convicted of assault and bank robbery. Thus, from the commencement of the State's case, the State labeled Elliott a habitual criminal, thereby removing one of the constitutional benefits afforded all defendants in a criminal case — a right to a fair and impartial jury. *See Allard*, 283 Ark. at 318, 675 S.W.2d at 830 (where, at beginning of trial, the court clerk read to the jury the aggravated-robbery indictment, which included two additional charges of theft by receiving pending against Allard in a separate case). Although the trial judge here tried to admonish the jury in an attempt to cure the error, this is not the sort of error that can be so cured. *See id.* We are mindful of this court's decision in *Stanley v. State*, 324 Ark. 310, 920 S.W.2d 835 (1996), where the State's opening statement included a reference to "other offenses in another county," and this court held prejudicial error did not occur because overwhelming evidence existed as to Stanley's guilt. There, however, the State never specified Stanley's other charges or offenses, so we held that an admonition could have ameliorated the prosecutor's reference. Here, like the situation in *Allard*, the jury was told of Elliott's specific felony convictions and the jury was left with no doubt from the time the trial commenced that defendant Elliott was a habitual felon. Because the State's error was egregious at the outset of the trial, we cannot conclude beyond a reasonable doubt that the prosecutor's remark did not contribute to Elliott's conviction. Thus, we reverse and remand on this point.

*Elliot*, 335 Ark. at 392-393.

In *Elliott*, the prosecuting attorney deliberately told the jury in opening statement that the defendant had prior felony convictions, and the trial judge admonished the jury not to consider Elliott's prior trouble with the law. Even though the trial court admonished the jury, this court stated, "[T]he prosecuting attorney's error in his opening statement cannot be labeled a slight one," and that Elliot

was "denied one of the constitutional benefits afforded all defendants in criminal cases — a right to a fair and impartial jury." *Elliot, supra.* In the case before us, there was no admonition. The intent by the prosecutor was to place before the jury a confession no less damning than the prior felony convictions in *Elliott.* It would take but cursory review of this case for anyone to recognize immediately that the "vision" statement was the most powerful piece of evidence. This is especially so because of the lack of physical evidence. Thus, the temptation to use the statement in opening would likely be great. However, it is commonly known black-letter law that to be mentioned in opening, the evidence must be admissible. *Rank v. State,* 318 Ark. 109, 883 S.W.2d 843 (1994); *Mouser v. State,* 216 Ark. 965, 228 S.W.2d 472 (1950). When a confession has not been the subject of a *Denno* hearing, the prosecuting attorney mentions it in opening at his own peril. Had the statement later been found to be admissible, then there would have been no error. *Rank, supra.* However, the statement was found inadmissible. The discussion in *Smith v. State,* 205 Ark. 1075, 172 S.W.2d 249 (1943), is on point. Therein, this court stated:

> Therefore we hold that reversible error was committed in this case because of the reference to the alleged confession in opening statement by the prosecuting attorney over the objection of the defendant, and without any cautionary instruction of the court, and because the confession was inadmissible at all times.

*Smith,* 205 Ark. at 1084. Such is the case before us. The confession was found inadmissible. The wiser course would have been for the prosecuting attorney to join Barnes in seeking the *Denno* hearing prior to the trial.

The trial court was obliged to hold a *Denno* hearing on the admissibility of the "vision" statement. Ark. Code Ann.§ 16-89-107(b)(1) (1987). Due process requires that a defendant is entitled to "a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *State v. Sheppard,* 337 Ark. 1, 987 S.W.2d 677 (1999) (citing to *Jackson v. Denno,* 378 U.S. 368, 377 (1964) (citing *Rogers v. Richmond,* 365 U.S. 534 (1961)). A hearing was requested by Barnes prior to trial. The prosecutor and the court were aware of this. Still, the trial was commenced with no *Denno* hearing on the "vision" statement. Then, in opening, the prosecutor stated to the jury that Barnes had told police "he had had, quote a vision." This drew an objection, which was overruled with a comment by the judge that the *Denno* hearing would be held the next afternoon and that "if we

suppress it, he won't talk about it." The prosecutor then went back to his opening and stated:

> He will, Charles Barnes asked to speak to the officers and he told them he had a vision about the bloody murder of two older ladies near Ash Flat,—

The prosecutor thus placed the most critical and most damning aspects of the "vision" statement before the jury without any judicial review as required by due process under the federal constitution and under the Arkansas Constitution, Art. 2 § 8. Moreover, the trial court failed to provide any.

According to this court's holding in *Smith*, this case should be reversed. The majority have mistakenly relied upon harmless error. This court has routinely held that where evidence of guilt is overwhelming and the error slight, we can declare the error harmless and affirm. *Bledsoe v. State*, 344 Ark. 86, 39 S.W.3d 760 (2001). *See also, Kidd v. State*, 330 Ark. 479, 955 S.W.2d 505 (1997); *Abernathy v. State*, 325 Ark. 61, 925 S.W.2d 380 (1996). However, this court has clearly indicated that the harmless-error rule would not be applied when a fundamental right is violated. *Kennedy v. State*, 338 Ark. 125, 991 S.W.2d 606 (1999); *Allen v. State*, 310 Ark. 384, 838 S.W.2d 346 (1992). To conclude that a constitutional error is harmless and does not mandate reversal, this court must conclude beyond a reasonable doubt that the error did not contribute to the verdict. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). *See also, Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999), *Schalski v. State*, 322 Ark. 63, 907 S.W.2d 693 (1995); *Allen, supra*; *Vann v. State*, 309 Ark. 303, 831 S.W.2d 126 (1992); *Chapman v. California*, 386 U.S. 18 (1967). It is difficult to see how one might argue that the error did not contribute to the verdict in a fundamental way. The failure to hold a *Denno* hearing and then allow over objection the reference in opening statement to a disputed confession that is later found inadmissible is well beyond slight error. The statement was highly prejudicial, stating Barnes was plagued by nightmares of the murder of his victims. The bell was rung. The jury knew from the beginning of the trial that Barnes had made the "night vision" statement. Nothing could erase Barnes's "night vision" statement from the jury's minds as they heard the evidence during the trial. That bell was not and could not be unrung. Barnes was denied due process in that he was denied an impartial jury. This petition should be granted.

CORBIN and THORNTON, JJ., join in this dissent.